(No. 93-CC-2145–

BOYD BROTHERS, INC., Claimant, *v.* THE STATE OF ILLINOIS, Respondent.

*Order filed November 1, 1994.*
*Opinion filed November 30, 1998.*
*Order filed July 14, 1999.*

HUSEN & EPPENBERGER (STEPHEN D. GAY, of counsel) and GARY WEINTRAUB, for Claimant.

JIM E. RYAN, Attorney General (LAWRENCE C. RIPPE, of counsel) and SORLING, NORTHRUP, HANNA, CULLEN & COCHRAN (PATRICK V. REILLEY, of counsel), for Respondent.

## ORDER

FREDERICK, J.

This cause comes before the Court on Claimant's renewed motion for summary judgment and Respondent's motion for summary judgment on all claims for extras in area other than the northeast quadrant, and on the issue of Claimant's claim for compensation for idle equipment, and the Court having reviewed the pleadings, affidavits, depositions, exhibits and arguments, and the Court being fully advised in the premises, wherefore, the Court finds:

1. That the Abandoned Mines Lands Reclamation Council, "AML," designed the reclamation plans for the St. Ellen Mine site in St. Clair County, Illinois.

2. That the AML plans which were incorporated into the contract failed to take into account the Dunn Geoscience Report, failed to correctly incorporate the AML's own core sample data, the cooperative wildlife service data, and failed to include the project manager's posterboard which indicated slurry that did not appear on the AML plans.

3. That article 102.05 of the Standard Specifications indicated that the subsurface information set forth in the AML plans represented the best knowledge of the Department as to the location, character or quantity of the materials encountered.

4. That Respondent failed to provide Claimant with the Dunn Geoscience Report, the posterboard and soil core sample chart and results prior to the bid acceptance although requested to do so by Claimant. Standard Specifications, article 102.05 indicated that all soil information

upon which the design was prepared was available for inspection by bidders.

5. That Respondent drafted the contract.

6. That under the terms of the contract, the Claimant was to complete the work in accordance with the plans and specifications.

7. Article 105.04 required that all work performed and all materials furnished shall be in reasonably close conformity with the lines, grades, cross-sections, dimensions, and material requirements, including tolerances, shown on the plans or indicated on the specifications.

8. That articles 101.24 and 104.01 indicate that the plans and specifications show the location, character, dimensions, and details of the work to be done and prescribe a complete outline of the work which the contractor undertook to do to satisfy the contract.

9. That the plans prepared by the project manager differed materially from the actual work to be done in that the soil lines in the plans were substantially different than those actually encountered; there was substantial slurry encountered that was not shown on the plans and specifications; and there were buried levees and dams now shown on the plans.

10. That the Claimant's inspection of the site prior to bidding was reasonable in light of the conduct of the Respondent.

11. That AML failed to obtain the right-of-way for the Ahring property prior to letting the contract in violation of the terms of the contract.

12. That the Dunn Geoscience Report was reasonably accurate in regard to the conditions at the site.

13. That because of the defective plans, the following additional work was required:

(a) In the north quadrant, approximately 258,425 cubic yards of mine refuse were below the grade indicated on the AML plans;

(b) In the west area, approximately 146,403 cubic yards of mine refuse material were below the grade indicated on the AML plans;

(c) The moisture content of much of the material to be excavated was materially higher;

(d) That the amount of wet material to be handled above and below the AML plan lines was materially increased;

(e) Different methods were required to obtain and haul the refuse because of the changed character of the refuse than could have been anticipated from the AML plans;

(f) Hauling distances were increased and top loading was required because of the character of the refuse which could not have been anticipated from the AML plans;

(g) Drainage as called for in the AML plans could not be achieved because soil lines were not accurate;

(h) That the delays in obtaining the right-of-ways delayed implementing a drainage plan, required pumping, and allowed for trapping of moisture.

14. On March 12, 1992, Claimant gave AML notice in writing that the actual site conditions were materially different from those shown on the AML plans.

15. That Respondent by letter directed Claimant to remove all refuse above the upper surface of the soil.

16. That Claimant gave the notice through letters and progress reports required under the changed conditions clause of Standard Specifications, article 104.04.

17. That Respondent materially changed the scope of the work under the terms of the contract.

18. That Respondent required Claimant to do substantial extra work as defined by Standard Specifications, article 101.15.

19. That the extra work was required because the work differed materially in design and required a change in the type of construction.

20. That adjustments in compensation and contract under these circumstances are to be made in accordance with articles 104.03 and 108.09.

21. That the AML's requirement that Claimant remove all refuse above the upper surface of the soil was a significant change in the character of the work.

22. That the character of the work as altered differed materially in kind and nature from that involved or included in the original proposed construction.

23. That AML had written an actual notice of the changed conditions and character of the work under the contract.

24. That the parties were unable to agree on a basis for an adjustment of the contract price.

25. That in the letter to Claimant to continue work, AML indicated article 109.03 of the Standard Specifications addresses the issue of how payment is to be made for increased or decreased quantities of contract unit pay price.

26. That Respondent refused to adopt a contract and payment adjustment.

27. That the contract documents affirmatively represented the subsurface conditions which form the basis of this claim.

28. That the contractor acted as a reasonably prudent contractor in interpreting the contract documents.

29. The contractor reasonably relied on the subsurface conditions in the contract documents.

30. The subsurface conditions actually encountered differed materially from the subsurface conditions indicated in the contract.

31. The actual subsurface conditions were reasonably unforeseeable.

32. That Claimant had excess costs solely attributable to the materially different subsurface conditions.

33. That article 109.04 requires additional compensation to be paid by the force account method unless the parties agree otherwise.

34. That AML denied Claimant's claim for extra compensation on March 26, 1992.

35. On June 2, 1992, AML rejected Claimant's contentions of differing site conditions and rejected the force account billings.

36. That Claimant is entitled to a summary judgment as to liability as a matter of law.

37. That Respondent is not entitled to a summary judgment as a matter of law.

38. That Respondent breached the agreement in denying Claimant's claims for extra compensation and

rejecting Claimant's contentions of differing site conditions and failing to pay Claimant for the extra work.

39. That in light of the substantial extra work required, the amount of work actually completed by Claimant, the lack of appropriated funds available to pay Claimant for work done and to be done, and Respondent's rejections of Claimant's claims for extra work, Claimant was justified in Claimant's decision to stop working on the project.

40. That the problems with this project are all directly related to AML's erroneous plans and failure to provide Claimant with requested documents.

41. That there are no material, undisputed issues of fact as to Respondent's liability for breach of the contract.

42. That there are material issues of fact remaining as to damages, particularly as to whether damages are limited to the northeast quadrant, the idle equipment issue, and the method of computing damages.

43. That there may also be an issue as to requiring the State court proceeding to be completed before issuing a final opinion in this Court.

Therefore, it is ordered:

A. That summary judgment as to liability only for breach of the contract is entered in favor of Claimant.

B. That the motions for summary judgment filed by Respondent are denied.

C. That the cause is remanded to the commissioner assigned to the case with directions to set the cause for trial on the issue of damages only.

D. That the Commissioner is directed to hold the hearing on damages at the Commissioner's earliest convenience without concern for the State court proceeding.

## OPINION

FREDERICK, J.

Claimant, Boyd Brothers, Inc., filed its complaint in the Court of Claims sounding in breach of contract on February 23, 1993. On November 1, 1994, an order granting Claimant's motion for summary judgment as to liability only was entered by the Court. The damage issues were tried before Commissioner Michael Kane. The Court has considered all of the evidence and testimony presented and all of the briefs and arguments of the parties.

### The Facts

The St. Ellen Mine site is located in St. Clair County on the western edge of the City of O'Fallon, Illinois. The site covers two hundred acres. Mining operations at the St. Ellen site had left a scarred surface upon which there had been deposited approximately 2.8 million cubic yards of mine refuse. On November 1, 1991, the Illinois Abandoned Mine Lands Reclamation Council (hereinafter referred to as AML) put out for bid a project to rehabilitate the St. Ellen site. The site had become newsworthy due to safety concerns raised by local residents and by the possibility that air and water quality were being affected by the material on the site. The St. Ellen Rehabilitation Project was principally designed by AML employee, Thomas Nelson, who also acted as AML's project manager. Documents furnished to the bidders included a 77-page schedule of drawings prepared by Mr. Nelson. The completed project would leave a large mound of mine refuse covered with soil and grass, a pond, and grasses and other vegetation at the original soil level. The winning bidder would have to move or remove much of the refuse. The State's contract documents did not distinguish between the types of mine refuse, even though

there are two types of refuse recognized within the industry. The first type of refuse is gob, a course refuse usually deposited in large steep piles. Gob results from the coal sorting process. The second type of refuse is slurry, a fine silty material which typically remains after the coal washing process is completed. The operations to remove these two types of refuse differ greatly and it is clearly more expensive to remove slurry than gob.

The contract documents included the contract text, the special provisions, the plans and specifications, and the Standard Specifications for Road and Bridge Construction. In the contract, AML stated that it had acquired all of the rights-of-way from adjoining landowners, a representation which was not true.

Seven bids were submitted on the project ranging from $3,346,053 to $6,177,839. The low bidder on the job did not receive the contract due to concerns about its financial ability to complete the job. The Claimant submitted the second lowest bid and that bid was accepted by AML in an award letter to Boyd Brothers, Inc. dated December 24, 1991. On February 3, 1992, AML and Boyd Brothers, Inc. entered into a contract for the performance of the work at the St. Ellen Mine site.

The work on this project began in February of 1992. In December of 1992, the Claimant ceased work for the winter months and in February of 1993, this action was filed. Claimant refused to return to work in the spring of 1993 due to the conflict regarding payment.

At the completion of discovery, Claimant moved for summary judgment on the issue of liability. On November 1, 1994, this Court entered an order granting summary judgment in favor of the Claimant and against the Respondent on the issue of liability for breach of contract. On November 24, 1995, this Court entered a second order upon

Respondent's motion for reconsideration clarifying its previous grant of summary judgment and stated therein that, "Summary judgment is to liability only. The measure of damages, amount of damages, areas of damages, type of damages, and scope of damages are all unresolved issues wherein testimony will be required to resolve those issues." Those orders were based in part upon the failure of the Respondent to disclose during the bidding process certain information in its possession which reflected the accurate sub-surface conditions. It is clear that the Respondent failed to disclose to the bidders a document referred to as the Dunn Geoscience Report, a drill and material analysis prepared in February of 1977 and utilized by various staff members of AML prior to 1991. Had the information been disclosed to the bidders, Claimant would have known that there was a slurry pond underneath the gob pile in the northeast quadrant of the site, a fact that Claimant ultimately discovered during the work in March of 1992.

It is noteworthy that throughout the claim process but before this cause of action was filed, the State had agreed that additional compensation was warranted. The amount of that compensation and the method by which to compute the amount were the unresolved issues between the parties. What began as a dispute over the proper method of payment for additional work in the northeast quadrant evolved into a dispute regarding the whole site.

Before reviewing the various issues of damages, we must discuss the previous two court orders. The first order directed the commissioner to hold a hearing on the issue of damages only, but did not specify upon which claims liability was being directed. However, the order of February 24, 1995, deleted a substantial portion of language and certain findings for the Claimant. Accordingly,

the area of damages, measure of damages, and scope of damages were left unresolved.

It is Claimant's position that Claimant is entitled to damages under four separate categories. First, Claimant believes it is entitled to compensation because of a change in the scope and character of the work. Second, Claimant seeks compensation because of the State's failure to obtain the necessary consents of adjoining landowners. Third, Claimant seeks compensation due to the problems caused by the State's failure to disclose the existence of the slurry pond which caused Claimant's equipment to sit idle for lengthy periods, thereby causing Claimant damages. Finally, Claimant believes that all of the aforesaid problems caused the Claimant additional consequential damages which are compensable.

## Analysis

In order for Claimant to complete the work specified in the contract, it was necessary to have the consent of the adjoining landowners for the use of their property for getting on and off the job site in addition to drainage functions. Although AML represented to the bidders that it had obtained all consents necessary from the adjoining landowners, that was not the case. Specifically, there were two property owners at the southwest end of the site who had not consented to the State's use of their land as late as April of 1992. A small portion of this claim is based on the State's failure to obtain those consents in a timely fashion. However, it appears that there are no compensable damages as a result of the State's failure. The Roach property caused no delay, while the delay attributable to the Ahring property caused the Claimant no damage. The pre-construction meetings between the parties which were held simultaneously with these problems reveal no significant construction sequencing difficulties caused to

the Claimant. Additionally, Claimant's own job superintendent testified that Claimant suffered no damages due to the delay. Therefore, this portion of Claimant's claim should be denied.

The work contemplated in the contract included the excavation of mine refuse, the construction of a disposal mount, and the landscaping of much of the site. The eastern portion of the site contained the slurry pond hidden by the gob pile. The northwest section of the site, which was the largest of the three sections, contained a 14-acre pond of water and obvious wet materials. The southeast section was to contain the disposal mound and required the least amount of the contractor's attention. Claimant contends that the changed conditions which this Court has previously referenced affected the complete site and, therefore, the Claimant should be compensated for work done on changed conditions as to the whole job. The State's contention is that the only area containing undisclosed slurry was in the northeast quarter and any damages for changed conditions should be essentially limited to that quadrant. Additionally, the Claimant attempts to utilize a force account billing method for the claimed changed conditions which the Respondent rejects. It is the State's contention that the Court should look at the Claimant's internal cost coding to determine the true cost of the changed conditions. The Court points out that the contract sets forth, in article 104.00 of the special provisions, the method of compensating Claimant for additional work for the unanticipated quantity of slurry in the northeast quadrant:

"If the alterations of changes in quantity significantly changes the character of the work * * * an adjustment excluding loss of anticipated profits, will be made to the contract. The basis for the adjustment shall be agreed upon prior to the performance of the work. If the basis cannot be agreed upon, then an adjustment will be made either for or against the contractor in such amount as the engineer may determine to be fair and equitable. Special provisions control over the standard specifications in the case of a conflict."

In evaluating the Claimant's position with regards to changed conditions, it is essential to contrast the observations of the northeast quadrant with that of the west and southwest quadrants prior to the job being bid. Slurry and acid water on the western half of the site were plainly visible to anyone who inspected the west side prior to the bidding of the contract. The plans and specifications also indicated that vehicular traffic would be limited due to steep grades and soft surface conditions. Steven Boyd, one of the owners of the Claimant company, observed the conditions while preparing the Claimant's bid and conceded that the west side was extremely wet. Additionally, contractors who bid the job against the Claimant had an opportunity to inspect the site. Their observations persuaded the potential bidders that the entire west half of the site would have to be top-loaded. Also, the large amounts of slurry would create problems for the disposal mound to be built on the southeast portion of the property.

Slurry excavation requires a totally different process than the removal of gob. Because of its consistency, the slurry must be top-loaded, a much more expensive process than other methods of removing mine refuse. The differences between the northeast quadrant and the westerly quadrant could be seen by the naked eye and it is reasonable to conclude that the more likely alternative for removal of the waste on the west portion of the site was the top-loading method. After all of the other bidders examined and tested the western half of the site, they determined that due to the large amount of wet slurry, the entire western half would have to be top-loaded and those bidders considered that in the computation of their bids. The inspection done of the entire site by the Claimant proved to be inadequate. AML's failure to disclose the

slurry pond in the northeast quadrant was the fault of AML, but the erroneous conclusions about the method of removal on the western half of the site which factored into Claimant's bid were the product of Claimant's own inspection and the fault involved attributable to the Claimant.

What makes this case even more complicated is the fact that the soil lines depicted on the plans were wrong. A substantial portion of mine refuse was encountered below the lines and grades shown in the AML plans. These mistakes were not only in the northeast quadrant but also on the westerly quadrant. Additionally, there were undisclosed underground levies and dikes on the west portion of the site. A combination of these factors affected the moisture content of the materials encountered below the lines and grades shown on the plans which, in turn, affected the cost of moving the materials. The estimated quantity of mine refuse to be moved proved to be substantially correct. However, the directive in March by AML to remove all waste to the soil lines still constituted a significant change in the character of the work to be performed by the Claimant, in light of the erroneous soil lines on the plans. The fact that the quantities ultimately moved proved to be substantially accurate does not diminish the fact that the character of the work changed significantly.

After carefully and tediously reviewing all of the evidence, the Court finds the Claimant should be awarded one million six hundred thousand dollars ($1,600,000) for the additional work on the St. Ellen project. This amount is based on the forced account method which was utilized for other extra work during the project. During the work, AML indicated that Claimant would be compensated under the force account method if the parties were unable

to agree on either a lump sum or unit price basis, as is the case here. The standard proposed by the State in its arguments provides little or no guideline to the trier of fact in determining adequate compensation for the Claimant.

The Claimant's request for damages based on idle equipment, while valid, is inflated. The uncertainty at the site as to what conditions would be encountered caused Claimant to maintain idle equipment at the site. Further complicating matters was AML's refusal to grant stop work requests or redesign the job after the changed conditions were discovered. Under these circumstances, it is appropriate that payment be made for the Claimant's inability to use that equipment. After carefully reviewing all of the evidence, we find that Claimant should be awarded the amount of six hundred thousand dollars ($600,000) for its idle equipment claim.

Claimant maintains that as a result of AML's failure to make payments on the St. Ellen's job, Claimant lost its bonding capability and its ability to do further public or governmental work. Claimant also relinquished its IDOT pre-qualification status. Based on the evidence presented, we find that the Claimant did lose $323,425 as a result of its inability to procure the Marion Floodway Project as a general contractor. Claimant actually did the same work without being designated as the general contractor, but suffered the above loss. Any additional claims of consequential damages are too tenuous to require compensation from the State.

Claimant also maintains that the State has wrongfully withheld monies from Claimant for work done. We find that Respondent and Respondent alone breached the contract. The $184,000 that has been withheld from the Claimant for work completed and approved by AML should be paid to Claimant. These funds have

been segregated and held in an account since 1992. These monies should have been paid to the Claimant.

We further find that Claimant has proven no other damages by a preponderance of the evidence. However, before the Court can make a final award, there are several questions that must be answered by the parties.

The first question to be answered is whether the State court action filed by the State against Boyd Brothers, Inc. is still pending. At an earlier point in the litigation, this Court was advised that the State had filed an action against the Claimant in State court arising out of the St. Ellen site contract. While this Court may have been able to hear the State's claim under our recoupment jurisdiction, the State chose to file suit in State court. (705 ILCS 505/8(e).) Pursuant to 74 Ill. Adm. Code 790.60a, any complaint filed or pending in the Court of Claims shall be continued generally, subject to the provisions of section 790.70 until the final disposition of all other claims or proceedings arising from the same occurrence or transaction.

This case is very different from the usual case as the State filed the action in State court. Most exhaustion of remedies issues involve other claims by the Claimant. We do not decide here whether we can or cannot enter a final decision under the procedural facts of this case. If the State court action has concluded, there is no issue of exhaustion of remedies. If the State court proceeding is still pending, we will address the exhaustion issue in a separate order. The exhaustion issue also may be moot if the State court action involves the same parties and issues as decided herein and the State court enters final orders regarding the case.

The second inquiry to be answered must be answered in any breach of contract case. The Court requires

information as part of the record, indicating that sufficient funds were appropriated to have covered the breach. (*Lowenberg/Fitch Partnership v. State* (1986), 38 Ill. Ct. Cl. 227; *Ude, Inc. v. State* (1982), 35 Ill. Ct. Cl. 384.) The Court requires the information as to the amount appropriated for the project, the total amount which lapsed or which is still in accounts, and the amount which could have been transferred to pay the damages we have found in this case. Until these questions are answered to the Court's satisfaction, the Court is not able to make an award. *First National Bank of Springfield v. State* (1990), 43 Ill. Ct. Cl. 1.

The third issue is whether Claimant filed for bankruptcy protection and, if so, the status of any bankruptcy affecting Claimant and the distribution of any award. At earlier proceedings, the Claimant indicated it may be filing for bankruptcy protection.

### Order

Based on the foregoing findings, it is the order of the Court as follows:

A. That Claimant and Respondent shall each fully advise the Court in writing of the status of the State court proceeding within 21 days of the date of this order.

B. That Respondent shall notify the Court in writing of the following information within 21 days:

(1) The amount of funds which lapsed for this contract;

(2) The amount of funds currently held by the State to pay for work completed by Claimant but not paid;

(3) That amount of funds which could have been transferred from other line items to pay the $2,707,425 damages the Court has found that Claimant has proven by a preponderance of the evidence.

C. That Claimant should notify the Court within 21 days as to whether Claimant has filed for bankruptcy protection since this claim was filed, and if so, the status of such bankruptcy, including the case number, court in which it was filed, and the name and address of the trustee.

## ORDER

FREDERICK, J.

This cause coming on to be heard on the Claimant's petition for rehearing, the Court being fully advised in the premises, the Court finds:

On November 1, 1994, we granted Claimant's motion for summary judgment as to liability only. We remanded the case to Commissioner Michael Kane for a trial as to damages. On February 24, 1995, we entered an order which clarified our previous order, and left open the area of damages, measure of damages, and scope of damages. On November 30, 1998, we filed an opinion which (1) denied Claimant's claim for damages for failure of Respondent to obtain consents from adjoining landowners; (2) found Claimant entitled to $1,600,000 for additional work on the St. Ellen project; (3) found Claimant entitled to $600,000 for damages based upon idle equipment; (4) found Claimant entitled to $323,425 for loss of a contract because it lost its bonding capability because of the State's failure to pay; (5) found Claimant entitled to $184,000 in retainage wrongfully withheld from Claimant; and (6) denied any other damages. The opinion ordered (1) the parties to advise the Court of the status of an ancillary circuit court proceeding; (2) the Respondent to notify the Court of the status of lapsed funds to pay this claim; and (3) for the Claimant to notify the Court of any pending bankruptcy actions instituted by

Claimant. The opinion contemplated a total award of $2,707,425. The opinion, however, was not a final order inasmuch as the Court needed the information requested in order to determine if sufficient funds lapsed that could be used to pay any award.

Both parties complied with the opinion and supplied information to the Court. Claimant filed a petition for rehearing which will be discussed later in detail. Oral arguments were held on May 10, 1999, on the petition for rehearing and other matters related to this case.

The Court is now prepared to enter a final order in this matter.

At oral argument, Respondent's counsel assured the Court that the Respondent would dismiss the State circuit court action upon entry of a final order in this cause. The Respondent filed a written response to the opinion which reported that (1) $16,997.86 lapsed from funds appropriated for the St. Ellen site; (2) the amount of $180,386.47 is held in an unnamed bank trust account as retainage on the St. Ellen site; (3) the amount of funds available to pay this claim is $10,419,441.71, which represents the sum of $16,997.86 lapsed from the 1992 construction grant, and the amounts remaining in the 1995-1998 simplified grants from the U.S. government. Payment of the later funds, however, are subject to approval from the United States Office of Surface Mining. The Claimant reports that it has not filed for bankruptcy and no bankruptcy proceedings are pending against it, but that it is effectively out of business.

The petition for rehearing asserts that (1) the Court misapplied the forced account method of calculation of the extra work claim (base damages) and should award $3,130,129 for these damages; (2) the Court erred in finding that the Claimant's examination of the site was inadequate; (3) the idle equipment award should be $1,955,344.32; (4)

the Court erred in denying an award for failure of Respondent to obtain consents from adjoining landowners; (5) the Court did not address additional areas of damage; (6) the Court did not award interest; and (7) the Court should award damages to compensate Claimant for a judgment that was entered against it and in favor of a landowner for damages caused by removal of too much soil. Claimant seeks a total of $9,023,797.

Respondent opposes the petition for rehearing, asserting that "while each party may disagree with the Court's calculation of the award," the petition for rehearing should be denied.

We have carefully reexamined the record and the arguments of the parties. As is the usual case in matters of this type, the calculation of damages, and the allocation of fault is less than an exact science. Upon reexamination, we believe that the idle equipment award should be increased. The total amount sought in the petition for rehearing for these costs is $1,955,344. Our opinion would award $600,000 or 31 percent of the amount claimed. Reconsidering the record, and recognizing the inability to determine a mathematically precise amount, we find that the record supports an award equal to 55 percent, or $1,075,439.

We have considered the other points raised in the petition for rehearing, and have determined that they should be denied.

It is therefore ordered, adjudged and decreed that, in full and complete satisfaction of this claim, Claimant is awarded the sum of three million one hundred ninety six thousand two hundred forty-eight and 33/100 ($3,196,248.33) dollars, such award consisting of the following:

1. Claimant is awarded $16,997.86 from the lapsed funds.

2. Claimant is awarded $180,386.47 (plus any accrued interest) in the bank trust account.

3. Claimant is awarded two million nine hundred ninety-eight thousand eight hundred sixty-four and no/100 ($2,998,864) dollars payable from funds remaining in the 1995-1998 simplified grants from the U.S. government, subject to approval from the United States Office of Surface Mining.